**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **CRIMINAL NO. 19-CR-00418** |
| | : | |
| NEIL I. MITTIN | : | |
| | : | |

**DEFENDANT NEIL I. MITTIN'S SENTENCING MEMORANDUM**

This memorandum is respectfully submitted on behalf of Neil Mittin, who is scheduled to be sentenced by the Court on Thursday, March 5, 2020, at 9:30 a.m.  For the following reasons, Mr. Mittin respectfully requests that the Court impose a non-custodial sentence, such as home and/or community confinement.

**I.      INTRODUCTION**

On September 11, 2019, pursuant to his plea agreement with the Government, Mittin waived prosecution by indictment and pled guilty to an Information, charging him with one count of mail fraud, in violation of 18 U.S.C. § 1341.  Later, after extensive negotiations with the Government, Mittin agreed to a loss amount of $3.419 million.

Mr. Mittin, a dedicated husband, father, and grandfather, who has a long history of community service and helping others, should receive a non-custodial sentence, because: (1) this is his first criminal conduct, which is a marked deviation from a long law-abiding life; (2) he genuinely regrets his actions, is deeply embarrassed and ashamed by them, and is not at risk of reoffending; (3) he has made a substantial pre-payment of restitution in 2019 (ECF Doc. Nos. 20-21)[1] and will have paid $3 million (88%) of the total loss by, or shortly following,

---

[1]  The early payment equated with Mittin's gain from the offense conduct and would have been higher, but for an improper non-court-ordered freeze on his pension plan.

sentencing[2]; (4) he has a life-long passion for community service and helping others; (5) he will lose his ability to practice law, as his license has been suspended and he is in the process of resigning from the Bar; (6) he has suffered severe reputational harm as a result of the charge and the recurring attendant publicity; (7) he is 65-years-old and has health issues that are better managed outside of prison; and (8) a sentence that requires incarceration would have detrimental effects on his wife, daughters, and grandchildren, as well as his extended community family.

## II.     NEIL MITTIN

Mr. Mittin was born in Philadelphia, Pennsylvania, on October 16, 1954.  His parents, Nettie and Stanley Mittin, were married until the latter's death from heart failure in 2006.  Mr. Mittin is one of three siblings; one of his two sisters died tragically of bowel cancer.  Mr. Mittin's mother worked for the Commonwealth of Pennsylvania in the Office of Unemployment Compensation as a claims examiner.  His father owned a lumber yard and hardware store in Woodbury, New Jersey.

Mr. Mittin and his wife, Fern, have been married for over 42 years and have known each other for over 48 years.  They met in September 1971 at a high school gathering that was held at Fern's house and were married on June 26, 1977.  Mr. Mittin and his wife have two daughters, Stacey Beth Salsman, who is 38 years old, and Jamie Lauren Liebman, who is 35.  Mr. Mittin also has four granddaughters with whom he is very close.  Mr. Mittin is deeply devoted to his family.  Dr. Jessica Marinoff, a longtime family friend, notes that she "has always known Neil Mittin to be a loving father, husband, uncle, son, friend . . . and grandfather"; his love "for his

---

[2]  Mr. Mittin has entered into an agreement with the Government to make an additional restitution payment in January 2021 in an amount not less than $303,000 (which, based upon current balances, most likely will be in excess of that amount).  The payment is being deferred until 2021 to reduce potential federal tax liabilities associated with withdrawing the funds from a qualified pension plan and thus increases the amount of the restitution payment available to pay the victim.

four granddaughters is radiant."[3]  Richard Liebman remarks, "the Neil Mittin that I know is a devoted husband, dad, grandfather, father[-]in[-]law, son and son[-]in[-]law."

Mr. Mittin is a prostate cancer survivor; the cancer is in remission.  He currently has significant medical problems, including a recent diagnosis of Grave's Disease, an autoimmune disease, and suffers from ptosis (lid lag) and proptosis (pressure behind the eye causing bulging of eyes), because of that condition.  On February 28, 2020, Dr. Glenn McGrath, Mittin's endocrinologist, advised Mittin that the Grave's Disease is actively progressing and requires the removal of his thyroid.  (Dr. McGrath's letter is attached.)[4]

Mr. Mittin also suffers from high blood pressure and obstructive sleep apnea.  The former requires medication and dietary restrictions; the latter requires the strict use of a CPAP machine, which needs to be cleaned daily.  He is closely monitored by doctors, including a specialist, and takes several medications.

Mr. Mittin's family has dealt with medical complications since his childhood.  His older sister, Adele Abrams, began getting sick at age eight, and his parents "spent a great deal of time with physicians at CHOP trying to diagnose what was making her so chronically ill."  Years later, Ms. Abrams was diagnosed with Crohn's disease, which affected her physically and emotionally. When Abrams was hospitalized, Mittin visited her every morning and after work. "At a moment's notice," Mittin had to go to the hospital to give blood for Abrams, because they had the same blood type.  Ms. Abrams died in 1996 of bowel cancer.  Mr. Mittin's surviving sister remarks, "Both Neil and I saw how this affected our family.  This is one of the reasons we

---

[3]  The attached letters are in alphabetical order.

[4]  Dr. McGrath recommends that this surgery occur prior to any term of incarceration due to the complexities of managing Mittin's case, including, for example, his need for frequent blood tests.  If the Court imposes a custodial sentence, this can be accomplished by a surrender date of approximately 60 days after sentencing.

have stayed close together with our entire family."  Mr. Mittin's wife notes that it "was a sad day for Neil" when his sister passed away.  Mr. Mittin "always tried to comfort everyone else but he would cry in private."

Mr. Mittin is also dedicated to his 94-year-old mother, who currently lives in a nursing home.  Mr. Mittin's mother has "mobility problems and is confined to a wheelchair, has Crohn's disease, and has relied on a colostomy bag since having her large bowel removed at age 40 (PSR ¶ 76).  Mr. Mittin is "hands on there when she needs something" and orders her medical supplies (*Id*.).  He is his mother's contact person and sees her every week (*Id*.).  Mr. Mittin also shops for his mother.  Moreover, Mittin is an integral part of the decision making for his 93-year-old mother-in-law.

Mr. Mittin is passionate about community service and helping others.  He has served on the Board of his synagogue for decades, giving his time and providing other contributions.  As consistently attested in the letters of support for Mittin, he is his family's rock, and they heavily depend upon him; a custodial sentence would have obvious emotional and other negative consequences on Mittin's family and his extended community family.

Finally, Mittin was employed by Benjamin Foods, albeit no longer as a practicing lawyer, until it ceased operations on February 28, 2020.  As its President/CEO Howard Klayman remarked in his letter to the Court, Mittin "has been a mentor, friend and someone who has given us sound advice during some of our most difficult [family and business] times."

### III.    THE OFFENSE CONDUCT

As the Government has acknowledged, Mittin has taken full responsibility for his actions by pleading guilty and, as attested by those who know him best, he is deeply remorseful.  Nonetheless, it is important to provide the full background and context that led to the offense conduct here.  None of the facts in this section—or anywhere else in the memorandum—are

meant to excuse or justify Mittin's behavior, but are provided for the Court's understanding and consideration.

Mr. Mittin was employed as an attorney with Gay and Chacker ("G&C") for 38 years, until his termination from the firm on January 4, 2018.  Mr. Mittin was never a shareholder or partner of the firm, but rather an employee only.  On or about January 1, 1990, G&C and Mittin entered into a Professional Employment Agreement ("Employment Agreement"), which provided, in relevant part, that he was to receive a $100,000 salary, plus a percentage of the firm's gross receipts.  The Employment Agreement, which carried an original four-year term and automatically renewed for successive one-year terms, also stipulated that Mittin was to receive 50% of all fees generated by cases that were originated with the firm exclusively through a personal source or referral of Mittin, and the compensation on these cases was required to be paid "forthwith when the fee was collected."

During the term of his employment, Mittin's case load consisted of between 100-200 cases per year.  Many of the cases handled by Mittin (whether from a referral source of his or obtained through responding to telephone or Internet inquires at the firm) resulted in recoveries for the client of approximately $100,000 or less.  However, during his employment with the firm, there were approximately 36 cases handled by Mittin that resulted in recoveries greater than $100,000.

Then, in 2006, the Employment Agreement was modified, in that the percentage of the firm's gross receipts subject to sharing with Mittin was reduced, but his salary was increased to $150,000 only when Mittin learned from another G&C lawyer who had left the firm (and who was junior in age and experience to Mittin) that he had been receiving higher compensation.

Finally, in 2008, and contrary to the Employment Agreement, G&C advised Mittin (i) that there would no longer be a differentiation between cases originated by Mittin and cases worked on by him, but that (ii) he would receive 50% of the fees received by the firm for cases originated or worked on by him *only after* the aggregate fees received by the firm on such cases exceeded $300,000.  Therefore, as of 2008, origination no longer was relevant to the compensation paid to Mittin.  These changes, in retrospect, marked the beginning of Mittin's conduct at issue here.

Indeed, Mittin should have terminated his employment with G&C in 2008 when the entire compensation package was materially altered in violation of the Employment Agreement. Instead, Mittin elected to remain with the firm, but engaged in activities relating to approximately 41 cases over a ten-year period, which are at issue here.  As he admitted at the plea and as reflected in the PSR, beginning in at least January 2008, and continuing until January 2018, Mittin removed personal injury matters from G&C and referred them to a New Jersey attorney.  After resolving those matters, generally through a settlement, and obtaining legal fees, the outside attorney paid Mittin a referral fee, which was a share of the fees collected in those matters.  Mr. Mittin, as he has admitted, was not entitled to those referral fees.

G&C's unilateral changes to the Employment Agreement does not justify the use of "self-help" by Mittin under any circumstances.  However, Mittin improperly, and, as it turned out, unlawfully, reacted to those changes by taking steps to ensure that the lost compensation would be made up in other ways.  As hindsight shows, Mittin reached the $300,000 newly imposed threshold for the entire 2008-18 period, such that he would have received 50% of the fees obtained if the cases had remained at the firm, instead of the one-third of the fees obtained by the lawyer who had received the referral.  However, Mittin was unsure at the beginning of

each year whether he would reach the threshold.

The facts indicate that Mittin's "self-help' was out of desperation, not self-enrichment. In fact, Mittin has continued to live modestly, and his wife has worked full-time for 20 years.  As reported by Probation, Mittin has lived in the same home he purchased in 1985 for $169,000. There have been *no* allegations that Mittin has lived an extravagant lifestyle stemming from his conduct in this matter or otherwise frivolously dissipated his "gain" from the offense.[5]

The Government's assertions that Mittin committed this offense out of greed and vindictiveness toward his employer and to enrich himself (Gov't Br. at 2, 14-15) could not be further from the truth and are not supported by the facts.  As detailed above, and while he was not justified in doing so, Mittin committed the offense conduct out of fear and desperation after his Employment Agreement was unilaterally modified in a way that he feared would substantially decrease his income and affect his ability to earn a living.  Mr. Mittin's lifestyle is far from that of a greedy or rich man.  As noted, he has lived in the same home he purchased in 1985, his wife has worked full-time for decades, and he lives a humble life.  Moreover, as the Government notes (*id.* at 2), Mittin ended up receiving fewer proceeds from some of the cases that he referred out than he would have received had he not committed the instant offense, further evincing that Mittin acted out of fear and desperation, rather than greed and vindictiveness.

Again, and to be clear, Mittin is not justifying his actions.  He knows that what he did was wrong, has taken full responsibility by pleading guilty, and is deeply sorry for his conduct, as attested in all the letters of support.  This full context is being provided in the hope that it will

---

[5]  Indeed, Mittin's modest lifestyle has, paradoxically, permitted him to make near-full restitution at the time of sentencing.

be helpful to the Court in determining an appropriate sentence.

### IV.    APPLICABLE GUIDELINES RANGE AND APPLICABLE LAW

To determine an appropriate sentence under 18 U.S.C. § 3553(a), courts in this circuit:

(1) calculate the guidelines range; (2) rule on the motions of both parties and state whether any

departures are being granted; and (3) exercise discretion by considering the relevant § 3553(a)

factors in imposing a sentence, even if the sentence varies from the applicable guidelines range.

*United States v. Olhovsky*, 562 F.3d 530, 546-47 (3d Cir. 2009) (internal citation omitted);

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2009).

Mr. Mittin pled guilty to one count of mail fraud in violation of 18 U.S.C. § 1341.

Probation calculated an offense level of 24, for a guideline range of 51-63 months (PSR ¶¶ 55-

65, 102), which was largely driven by a loss figure of approximately $4.2 million.  However, the

parties have calculated the loss amount at $3.419 million and have informed Probation of that

number and the explanation for it.  According to the Government, in an email to Probation:

> The "reasonably foreseeable pecuniary harm" suffered by the victim in this case
> as a result of Mittin's criminal conduct is $3,419,000.  This figure, to which the
> parties agree, reflects the best estimate of the amount of money that G&C lost as a
> result of the fraud. This figure also reflects the actual loss that was foreseeable to
> Mittin when he embarked on his fraud. In other words, had Mittin not committed
> the fraud, G&C and its principals, Edward and Brian Chacker, would have
> received an additional $3,419,000 in funds (in fees and reimbursement of costs)
> during the years of the fraud.
>
> This loss calculation, most simply, is based on the total fees received by the firms
> for the cases that Mittin criminally referred (plus the costs G&C incurred on those
> cases), minus the share of those fees that Mittin would have received from G&C
> on those cases if he had not criminally referred them.  Mittin would have received
> 50% of the fees generated on cases that he originated, as well as 50% of the fees
> on cases worth less than $100,000 -- because those are the cases he would have
> handled if he had not committed the fraud.  If a case was not opened in the G&C
> firm before Mittin referred it to another firm, the government agreed that such
> conduct was not necessarily criminal and thus that the fees generated from those
> cases should not be included in loss.

Based upon the lower loss amount, the Government has calculated an offense level of 22, for a guideline range of 41-51 months.  However, Mittin respectfully submits that the offense level should be 20, for a guideline range of 33-41 months, because the 2-level enhancement for abuse of trust or use of a special skill under U.S.S.G. § 3B1.3 is not warranted.

Under U.S.S.G. § 3B1.3, courts are to impose a two-level enhancement if "the defendant abused a position of public or private trust . . . in a manner that significantly facilitates the commission or concealment of the offense."  *United States v. Douglas*, 885 F.3d 124, 127 (3d Cir. 2018) (citations omitted).  A position of public or private trust is defined as one "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."  U.S.S.G. § 3B1.3 cmt. n.1.  The enhancement "applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination," but "does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors."  *Id*.  In other words, according to the examples in the comment, the enhancement seemingly applies where the defendant had a fiduciary relationship and was in a "superior" position or position of power, such as a lawyer who embezzles a client's funds or a physician who abuses his patients.  As the Third Circuit held in *Douglas*, when determining if the defendant occupied a position of trust, "we will ask whether the defendant had the power to make decisions substantially free from supervision based on (1) a fiduciary or fiduciary-like relationship, or (2) an authoritative status that would lead his actions or judgment to be presumptively accepted."  *Douglas*, 885 F.3d at 133.

In this case, as discussed, Mittin was an employee of G&C.  He was not a shareholder or partner.  The statements from G&C that are reflected in the PSR suggest that Mittin was limited in the types of cases that he could handle and, as an employee, had limited discretion.  Accordingly, this case is not akin to the examples mentioned above, where a person in a position of trust and power abuses that trust to commit a crime against someone he is entrusted to protect.  *See* U.S.S.G. § 3B1.3 cmt. n.1.  Rather, this is a case where an employee stole from his employer, and thus the position of trust enhancement should not apply.  *See*, *e.g*., *United States v. Mauzy*, 529 F.Supp.2d 616, 619-620 (S.D. West V.A.) (rejecting enhancement where employee stole from attorney employer); *United States v. Lee*, 324 F. Supp. 2d 165, 166-167 (D. Me. 2004) (rejecting Probation's recommendation for two-level enhancement under 3B1.3 where employee stole from employer); s*ee also United States v. Buckman*, 2019 WL 142385, at *1-2, 8 (E.D.P.A. Jan. 8, 2019).  In *Buckman*, the defendant engaged in a scheme to defraud by making false representations to vulnerable homeowners facing foreclosure.  The court rejected a request for an enhancement based upon position of trust, finding that the defendant "did not assume a position of public or private trust necessary to trigger" the enhancement, but rather targeted victims by offering to save their homes.  According to the court, the defendant's conduct did not rise to the "level of a fiduciary-like relationship," and the defendant did not assume "authoritative status" that would lead to her "actions or judgment [being] presumptively accepted."  *See also Douglas*, 885 F.3d at 127.

Similarly, there should be no enhancement for the use of a special skill under U.S.S.G. § 3B1.3, because Mittin's conduct did not require special skills.  Referring cases to attorneys outside of G&C did not require any particular legal skill and could have been done by a non-lawyer.  *See*, *e.g*., *Lee*, 324 F. Supp. 2d 165, 166-167; *Buckman*, 2019 WL 142385, at *1-2, 8.

The Government cites to *United States v. Naselsky*, 561 F. App'x 155, 161 (3d Cir. 2014), to support its argument for a 2-level enhancement for abuse of trust or use of a special skill under U.S.S.G. § 3B1.3.  As the Government acknowledges (Gov't Br. at 9), *Naselsky* is an unpublished case with no precedential value.  In any event, *Naselsky* is distinguishable.  In *Naselsky*, the defendant, while a "senior member" (equivalent to, among other things, a "senior partner") at his law firm, facilitated real estate transactions between two of his clients.  After one of the clients paid the defendant's law firm, the defendant pressured the client to give him an extra $100,000 "to take care of" him for going "above and beyond the call of duty."  The defendant's other client, who was on the other side of the same transactions, also paid him.  *Id.* at 156-57.  The defendant, however, kept the money from the clients and did not report it to his law firm.  *Id.*  "On these facts," the Court found that a 2-level enhancement for abuse of trust was proper because, among other things, the defendant "alone was in an authoritative position to seek the additional payments at issue from his clients and business partners, and to convince them that he had permission from the firm to do so."  *Id.* at 161.

Similarly, with respect to special skills, the Court found that the "Government introduced evidence" that, *inter alia*, the "wrongdoing at issue was enabled predominantly, if not exclusively, by" the defendant's "application of his abilities as an experienced real-estate lawyer."  *Id.* at 161-62.

Here, by contrast, Mittin was an employee (not a "senior partner"), and he did not abuse a position of trust with respect to any clients, to whom he had a fiduciary duty.  Nor were Mittin's skills as an attorney necessary to accomplish the offense conduct, as was the case in *Naselsky*.[6]

---

[6]  The Government cites several other cases for the proposition that a lawyer occupies a position of trust with respect to his clients (Gov't Br. at 9-10).  Mr. Mittin does not dispute that proposition.  But, those are not the facts of this case.  Mr. Mittin did not abuse his position of trust with respect to any clients.

Therefore, without the enhancement, the offense level should be 20, for an applicable guideline range of 33-41 months.

## V.     VARIANCE

Mr. Mittin merits a "variance," as that term is defined in *United States v. Jackson*, 467 F.3d 834, 837 n.2 (3d Cir. 2006), from the applicable guidelines range for the reasons detailed below.  In fact, there are a number of § 3553(a) factors that support a downward variance from the advisory guidelines range in this case.

### 1.   This is Mittin's first criminal conduct, which is a marked deviation from a long law-abiding life.

As noted by Probation, Mittin has no prior criminal history (PSR ¶¶ 66-72).  Mr. Mittin has led a law-abiding life; the instant conduct was an aberration in an otherwise unblemished life.  Those who are close to Mittin have consistently confirmed that the offense conduct is "out-of-character for him."  Debbie Davis, a friend of ten years, wrote "[t]hat this has shocked me tremendously because this is the last thing I ever expected from such a kind-hearted, helpful and devoted individual."  Mr. Mittin's friend of many years, Jonathan Ellis, Esq., states that the conduct to which Mittin has pled guilty is "completely out of character with the Neil Mittin I know.  I have always found Neil to be an honorable and decent person . . .."  Robert Rosen, who has known Mittin for 25 years, remarks, "[w]hile I am aware of [Mr. Mittin's] guilty plea . . . this is not in keeping with the man I have known for all of these years."  Helen and Neil Shupak, friends of Mittin for more than 30 years, also have stated that they found "this so out of character for Neil, who we know as a kind [] gentlem[a]n with a good heart; a mensch."  Rabbi David Glanzberg-Krainin, of Beth Sholom Congregation, Elkins Park, who has known Mittin for more

than fifteen years, notes that "in all of my dealings with Neil Mittin, I have experienced him to be a person of exemplary character."[7]

### 2.  Mr. Mittin has taken full responsibility for and genuinely regrets his actions, is deeply embarrassed and ashamed by them, and is not at risk of reoffending.

**Responsibility and Remorse**

Mr. Mittin has accepted full responsibility for his actions and pled guilty on September 11, 2019.  As acknowledged by Probation, Mittin "has 'clearly demonstrated' acceptance of responsibility for the offense" (PSR ¶ 63).  He also has "assisted authorities in the investigation or prosecution of [his] own misconduct by timely notifying authorities of [his] intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently" (*Id.* ¶¶ 21, 64).

Mr. Mittin's family and friends also have confirmed that he is deeply remorseful, has learned from his mistakes, and is not at risk of reoffending.

*Rabbi Andrea L. Merow, Rabbi at his synagogue:*

> In the many conversations that I have had with Neil he has expressed sincere and deep remorse for his actions and his desire to make things right.  He is also devastated with how his actions have affected his wife and children . . . . We know that all human beings make mistakes, but . . . the key to making things right in the world is to express remorse and to try to bring goodness back into the world.

*Wife Fern:*

> [Neil] has admitted his wrong-doing and has, indeed, shown remorse.

---

[7] The Government claims that, at his guilty plea, Mittin revealed the "depth of his corruption" when he claimed that he did not even think that he was committing a crime when the conduct occurred (Gov't Br. at 2, 19).  The government misreads Mittin's statement.  When placed in context, Mittin's statement is properly interpreted to mean that, as a personal injury lawyer with no experience in criminal law, he was not aware that his conduct—for which he has assumed full responsibility—amounted to federal criminal conduct.  Again, as detailed here, including the letters from those who know him best, Mittin has taken full responsibility for his conduct and is deeply remorseful.

*Jamie Liebman, daughter:*

> [My father] understands that he has done wrong and expresses remorse for his actions.
>
> ***
>
> My father is a good man who made a terrible mistake . . . . [H]e knows what he did was wrong and regrets what he did every single day of his life.

*Michael and Eileen Weingram, friends:*

> From recent conversations with Neil, he has told us about how badly he feels that, through his actions, he has let so many people down.

*Linda and Leonard Abrams, Mittin's brother-in-law and his wife:*

> To his credit, Neil has assumed full responsibility for his actions and constantly expressed his remorse.

*Nicholas Stiglitz, friend:*

> Neil expressed a deep sense of remorse in making such a serious mistake. I am confident that in time Neil will emerge a better person.

Mr. Mittin's deep remorse for his misconduct is another factor that this Court should consider. *See United States v. Howe,* 543 F.3d at 132, 138 (3d Cir. 2008) (affirming probationary sentence, despite guidelines range of 18-24 months of imprisonment, because defendant was remorseful and finding that there is *no* requirement that defendant's remorse be "extraordinary").

### Shame and Embarrassment

As detailed in the letters of support, Mittin is deeply ashamed and embarrassed by his conduct. His entire community is aware of his prosecution, which has brought him great shame. Indeed, despite the support from his congregation and Rabbis, Mittin stopped attending board meetings for his synagogue, where he had been a board member for decades, "because he was embarrassed over the publicity from his" guilty plea (PSR ¶ 81).

## No Risk of Reoffending

Mr. Mittin has no risk of reoffending, given his age and lack of a prior criminal history; the Pretrial Services Office "has supervised" Mittin "without incident" (PSR ¶ 80).  As Leonard and Linda Abrams remarked, "We are more than confident that [Neil] will not be a repeat offender and will function as a productive, valued member of society if given the opportunity."  Mr. Mittin also has a supportive family who has been with him every step of the way as he deals with these difficult times.  Mr. Mittin also has the support of his community, as illustrated by all the letters of support he has received.  Given Mittin's zero chance of reoffending, specific deterrence is not an issue in this case.

### 3.   Mr. Mittin has a life-long passion for community service and helping others.

Mr. Mittin's family and friends have attested to his life-long passion for community service and helping others.

*Rabbi Merow:*

> Throughout the time I have known Neil he has been actively involved in the life of our synagogue community coming to religious services and serving on our board for decades.  He was involved in our Ways and Means Committee and with our Synagogue Theater Ad Book to support the synagogue.  He is kind, soft-spoken and compassionate to those he serves with and treats all with respect.

*Renee and Robert Van Naarden, friends of over 35 years:*

> Neil has always been honorable and a man of his word in any interaction we had had with him.  We have known Neil to be a charitable person particularly with his time and effort on behalf of those in need.

*Anne and Harvey Rubin, family friends:*

> Neil has been involved in many of the same committees, board of directors and social groups as we have over our time together at Beth Sholom Congregation.  Anne served with Neil on the synagogue's board of directors.  Neil proved to be generous with his time and over the years we have known him, has committed many hours to the synagogue, both in his devotion to worship and work that was needed on committees, which included fund raising for the synagogue.

*\*\**

Neil is devoted not only to the synagogue, but to his family.  It is not uncommon
to see Neil rush from an event for his child or grandchild to a meeting for a
committee that he is on . . ..  He is a well[-]respected member of the community
and someone you can reach out to for help . . ..  Hardworking, generous, caring
and devoted are some of the words we would use to describe Neil.

*Steven and Myrna Pressman, close friend of 45 years:*

In all these many years of knowing Neil we have never seen anything but
kindness, generosity, dedication and a willingness to help.

*\*\**

In addition to spending time with his family, Neil is a devoted member of Beth
Shalom Synagogue . . ..  [He] has volunteered many hours of his time to the
Board of Directors and the Board of Trustees.  Neil and Fern have been long time
members and have supported the Synagogue through their charitable
contributions as well.

*Harvey Friedrich, Executive Director Emeritus of Beth Sholom Congregation and friend:*

Neil is someone who demonstrates his commitment to our community through his
leadership, participation in programs and religious services, and his support, both
spiritually and financially.

*Rabbi Glanzberg-Krainin:*

For many years Neil has served on our congregation's Board of Directors and on
our congregation's Ways and Means Committee where he has devoted countless
hours . . ..  He has taken on leadership in our congregation never with an eye
toward personal gain, but rather only with the goal of furthering the health of the
congregation.

Dr. Jessica Marinoff, a family friend for nearly thirty years, notes that Mittin and his

family have been active members of their synagogue for decades:  Mittin "served on numerous

boards and committees, volunteering his time to support the local Jewish community."  Richard

M. Liebman remarks, "Neil is also a pillar of his community and an active member of his

synagogue."  Dr. Jack B. Gorman, Mittin's friend, states, "[I] have always found Neil Mittin to

be a solid and valuable member of the community" and has known Mittin to be "an upstanding

member of the community and has been a very active member of his synagogue."  Linda and

Leonard Abrams write that "Neil has been an active and well-respected member" of his religious community "for many years."

Mr. Mittin also has encouraged his children to be active members of the community and has been supportive of his synagogue's youth group.  As his longtime friend Michael Weingram has stated, Mittin has encouraged his daughters to "participate in events of our congregation's youth groups" and "often drove car-pool to help us and other friends get their children to events. And he would participate in those events as chaperone."

In addition to his passion for community service, Mittin is also deeply committed to helping others, even when he is dealing with his own hardships.

*Mark Finestone, brother-in-law:*

> Neil would do food shopping for my parents, and deliver the goods to my 93[-]year[-] old house bound parents.  When my Father passed away on May 19, 2019, Neil continued to shop and run errands for my mother.  Neil even went to the pharmacy for my parents and took them out on special occasions since it was difficult for my parents to get around.  Neil really helped my parents and I cannot be anymore thankful than I am.  He is truly one of a kind!

*Shira Grunfeld, former neighbor:*

> After my father passed away, [Neil] continuously looked out for my mother and her well-being.  She knew she could always count on him if she needed him which made me feel really at ease knowing she had him by her side.

*Norman L. Kotzer, CPA and friend:*

> In later years, both Mr. Mittin and I shared the experience of having our mothers in the same nursing home.  This is where I realized that this is a good, down[-]to[-]earth person.  At times that I could not visit my mother, who passed at the age of 100, [Neil] would regularly visit with her when he would come to spend time with his own mother.  I saw a [f]amilia[l] devotion that was in line with my observations of his overall family relationships.

> Neil Mittin values relationships.  In addition to watching out for my mother, he called me almost every day when I had cancer surgery.  His actions were extraordinary.

*Nicholas Stiglitz, friend and coworker:*

I currently take care of my 80+ year old Grandmother and work full time.  As a friend Neil always made it a point to ask how she was doing.  Neil had experience and information to guide me in the right direction on where to seek additional help for my Grandmother's needs.  Afterall, Neil had a similar circumstance with his own Mother at one-point prior.  He has truly been a good friend.

*Howard and Susan Buzgon, neighbors and friends:*

I think Neil's most outstanding characteristic is the way in which he always has a kind word and a compliment for everyone that he meets.  Indeed, he seems to always take a genuine interest in the lives of his friends.  He will always inquire about the health and well being, of them and their families.  Even when Neil has health problems of his own, he willingly shows concern and compassion for others.

*Dr. Elliott Maser, friend:*

Mr. Mittin was one of the first people that corresponded with me after I suffered a heart attack two years ago and has consistently checked in with me to monitor my condition.  I believe that his concern for my health and well-being is genuine.  We have . . . also discussed some common medical maladies that we both suffer from.

\*\*\*

Mittin can truly be counted upon "to be there."  He is not just a fair[-]weather friend.

*Randi Podel, longtime friend:*

When my husband had his first heart procedure Neil called and continues to check in.  [Neil] asked if there is anything he can do.  My husband believes these are not just words, and he doesn't say that about many people.  Even with what is going on in his life [Neil] continues to care about others.

*Debra Adderly, Mittin's wife's cousin:*

Recently I have had some medical issues resulting from a serious accident I was in.  I was hospitalized for two weeks, and continue recovering to this day.  Even with all Neil has going on with this matter and his health, he has called me regularly and I know while I was in the hospital he called and texted my husband many times a day not only to check in and see how things were, but to offer any assistance and support possible.  He is a selfless family man.

*Barbara Felzer, sister:*

> In 2016, I had been diagnosed with breast cancer.  My treatment consisted of a lumpectomy and directed radiation.  I needed a hysterectomy as well.  "Let's take one thing at a time"[;] "Don't do everything at once," he said.  He always had my back.  I never felt I went through these things alone.  He was there for me in the hospital helping me walk after my surgeries.

> I love my brother very much.  Please do not judge him harshly.  He is a good man, husband, father, son, brother, and grandfather.

Martin L. Trichon, Esq., Mittin's neighbor and friend for over 35 years, remarks, "Neil is the type of individual that you can go to if you had a problem.  If someone needed to pick up the kids because of a car problem, Neil volunteered.  If something was required to be fixed in your house, you could always count on Neil."  Another longtime friend, Robert Rosen, notes that, when he was terminated from a job that he had for over eighteen years, Mittin was "instrumental in helping me get through that transition and advised me on how to organize and start my own business that continues to this day."  Rabbi Glanzberg-Krainin has remarked, "Neil is always willing to listen; he never passes up an opportunity to do another person a favor.  I know of no one who does not consider Neil to be a kind and caring person . . . Neil is what we call in Yiddish a *mensch* – a fine human being."

Mr. Mittin's life-long passion for his community and helping people is another factor that supports the imposition of a non-custodial sentence.  *See, e.g., Howe,* 543 F.3d at 130, 132; *United States v. Tomko,* 562 F.3d 558, 560-61, 570 (3d Cir. 2009) (affirming non-custodial sentence, despite sentencing guidelines range of 12-18 months, because sentencing court properly relied on defendant's community ties as mitigating factor); *United States v. Pellegrini,* No. 08-210, 2008 WL 5061829, at *2, *4, *6 (D.N.J. Nov. 26, 20-08) (imposing non-custodial sentence, despite sentencing guidelines range of 63-78 months, after finding that defendant was a "productive and loved member of his community").  A term of imprisonment would, without

doubt, have a negative impact on Mittin's community, because of his dedication to helping

others.  As Ronald Goldstein notes in his letter, Mittin's "absence will impact his synagogue

family and his own family greatly."  And, in the words of Rabbi Merow, "I hope that the court

will allow Neil to continue to be an active part of our society."

**4.  Mr. Mittin's law license has been suspended, and he will lose it, and he has suffered severe reputational harm <u>as a result of the charge and the recurring attendant publicity.</u>**

Mr. Mittin already has suffered greatly.  As publicly reported[8] and as noted by Probation

(PSR ¶ 82), Mittin, who had been a lawyer for 40 years, has been suspended from the practice of

law by the Supreme Court of Pennsylvania.  He voluntarily will resign from the practice of law

in the Commonwealth, thereby losing the ability to continue in the profession in which he has

worked his entire career.  As his wife Fern has remarked, "[b]eing an attorney means the world

to Neil . . .."  His daughter Jamie added that the "law has always been his passion and he was

proud and honored to practice law."

As Mittin's wife Fern has reported (PSR ¶ 79), her husband, to put it bluntly, "is ruined."

He has suffered reputational harm as a result of the charge and the recurring publicity.  For

instance, Mittin's prosecution has been reported locally in Pennsylvania in the *Philadelphia*

*Business Journal*,[9] the *Intelligencer*,[10] the *Bucks County Courier Times*,[11] and the *Lower*

---

[8]  https://www.padisciplinaryboard.org/news-media/news-article/1170/montgomery-county-attorney-neil-i-mittin-temporarily-suspended

[9]  https://www.bizjournals.com/philadelphia/news/2019/07/19/lawyer-neill-mittin-gay-chacker-charged-fraud.html

[10]  https://www.theintell.com/news/20190720/huntington-valley-lawyer-charged-with-mail-fraud

[11]  https://www.buckscountycouriertimes.com/news/20190720/huntington-valley-lawyer-charged-with-mail-fraud

*Moreland Patch*,[12] and nationally in the Criminal Justice Section of the ABA Journal.[13]  This matter also has received international coverage in the Australasian Lawyer.[14]

Of course, Mittin's family and friends are well aware of his prosecution, which has brought him great shame and embarrassment.  As reported by Probation, although both of Mittin's Rabbis are very supportive of him, he stopped attending board meetings for his synagogue, where he had been a board member for decades, "because he was embarrassed over the publicity from his conviction" (PSR ¶ 81).  Rabbi Merow also notes that in "the last several months Neil has sought privacy and has not been at many public functions . . .."

The heavy price paid by Mittin, professionally, personally, and in his community, militates in favor of a non-custodial sentence.  *See United States v. Diambrosio*, No. CRIM. A. 04-66, 2008 WL 732031, at *3 (E.D. Pa. Mar. 13, 2008) (in sentencing the defendant to probation, the court noted, *inter alia*, that "Defendant already has paid a heavy price for his offense. He has lost his job, is forever barred from the securities industry, was fined $1 million by the Philadelphia Stock Exchange, and has a $2.1 million restitution obligation").

### 5.  Mr. Mittin is 65-years-old and has significant health issues that are better managed outside of prison.

As noted in the letters from his wife Fern, daughter Jamie, and others, Mittin is a cancer survivor.  He underwent surgery for prostate cancer at Johns Hopkins several years ago. Unfortunately, Mittin has developed other health problems.  Mr. Mittin's physician, Dr. Keith Sadel, reports that:

---

[12] https://patch.com/pennsylvania/uppermoreland/huntingdon-valley-lawyer-suspended-1-year-4-2m-fraud-case

[13] http://www.abajournal.com/news/article/lawyer-is-accused-of-defrauding-his-law-firm-by-secretly-referring-its-clients-to-outside-lawyers

[14] https://www..com/au/news/general/former-name-partner-accused-of-defrauding-his-law-firm-out-of-millions/thelawyermag 207526

Neil has recently been diagnosed with Grave's Disease.  Grave's Disease is an autoimmune disease where antibodies attach to the thyroid gland and subsequently cause the patient to be hyperthyroid (having an excess of thyroid hormone which accelerates metabolism).  He is followed closely by an endocrinologist, and is on methimazole to control the hyperthyroidism.  He also suffers with ptosis (lid lag) and proptosis (pressure behind the eye causing bulging of eyes) due to the Grave's disease.  He was treated with external radiation to his right eye, but still suffers with the above symptoms.  He has been followed closely with ophthalmology.  Also, with the methimazole treatment Neil needs to close[ly] follow up with endocrinology and internal medicine to have his blood monitored.

Neil suffers with obstructive sleep apnea and needs the strict use of a cpap machine – which needs to be cleaned daily.

I understand Neil has pled guilty to charges related to his work and he faces prison time.  As his physician I am concerned that if he goes to prison, he may not get the proper medical treatment due to the complexity of the illnesses described above.  Please take this information into consideration.  My hope is that Neil can have continuity of care provided by myself and the other specialist involved in his care.  Thank you.

Mr. Mittin's wife Fern also has described the medical issues he suffers from:

Neil's health issues are causing great concern to me and his family.  It was . . . in January of 2019 when I first noticed that Neil's right eye was not opened all the way.  He went to see his eye doctor . . . and she diagnosed [Neil] as suffering from Ptosis of the right eye.  [A specialist] diagnosed him as having swollen tissues behind his eyes causing him to have double vision, a symptom of Grave's Disease.  It was recommended that Neil undergo a 10-day period of radiation on his orbitals . . ..  After 6 weeks following radiation, it was determined that the tissues would not reduce until the thyroid gland performed normally.  Dr. Stefanyszyn, therefore, recommended orbital decompression surgery.  The risk associated with this surgery is that there could be damage to the optical nerves which could cause loss of sight.  Neil then went for a second opinion. . . and [the doctor] recommended not having the surgery due to the risks involved . . ..  [S]o he continues to suffer with double vision.  In the meantime, Neil's internist . . . ran extensive bloodwork on Neil, and it was determined that his TSH (Thyroid Stimulating Hormone) levels are dangerously low, showing that Neil is suffering from hypothyroidism caused by Grave's Disease . . ..  I am very worried about Neil's health, and I believe it is in his best interest to continue to be monitored frequently by his physicians.

As noted, Dr. Glenn McGrath, Mittin's endocrinologist, recently advised Mittin that the

Grave's Disease is actively progressing and requires the removal of his thyroid:

The two definitive treatments for Graves disease are radioactive iodine and surgery; however, the former is contraindicated in the setting of Mr. Mittin's very significant orbitopathy and therefore he requires surgical resection of his thyroid gland.

He will require inpatient stay at least overnight and perhaps a second day depending on postoperative calcium levels, His activity would be restricted In the Immediate postoperative period, and recovery of his normal level of activity would depend on his evaluation at the first postoperative visit with the surgeon, which is typically one to two weeks after surgery.

In closing, I cannot emphasize strongly enough the importance of Mr. Mittin proceeding with surgical cure of his very active Graves disease prior to [any] incarceration, given the complexities of managing his case while on methimazole, including the need for frequent blood tests, which stand in stark contrast to the ease of thyroid hormone replacement in the post thyroidectomy setting.

As Mittin's physician, Dr. Sadel, has opined, his health problems would be better managed outside of prison, and it is respectfully submitted that this factor favors a non-custodial sentence.

### 6.  Mr. Mittin has made a substantial pre-payment of restitution and will have paid $3 million (88%) of the total loss by sentencing.

Even before an order has been entered in this case, Mittin has made a substantial payment of restitution.  On December 31, 2019, Mittin paid $1.34 million of the $3.419 million that he has agreed to pay, and will pay an additional $1.66 million at, or shortly following, sentencing. Mr. Mittin's extraordinary efforts in paying the restitution in record-time and making the victims whole also favor a non-custodial sentence.  A non-custodial sentence also will enable Mittin to continue making his restitution payments.  *Diambrosio*, WL 732031, at *3 ((noting that a "non-incarcerative sentence will enable Defendant to continue making payments on his $2.1 million restitution obligation").[15]

---

[15]  However, notwithstanding these substantial payments, of which G&C has been advised regularly by the Government, on December 2, 2019, G&C commenced a civil action in the Philadelphia Court of Common Pleas, Case No. 1912001136, against the defendant, his wife Fern, the lawyer to whom Mittin had referred cases, and the latter's associate.  Efforts to reach mutually agreeable releases have been, not to understate it, painstaking, and, thus, the Mittins thereafter reluctantly commenced an action against G&C and its shareholders relating to amounts due

### 7. A sentence that requires incarceration would have detrimental effect on Mittin's wife, daughters, and grandchildren.

As his friends and those closest to him have consistently remarked, Mittin is deeply devoted to his family—his wife of over 40 years, his two daughters, four granddaughters, and his elderly mother and mother-in-law.

**Devoted Husband**

*Wife Fern:*

> I have known Neil since we were both 16 years of age, for 48 years. We have been married for over 42 years.

> While we were dating, Neil and I drove together to Temple University where we were undergraduates. He would drive to my house as I lived on the way, and we would take turns driving to college . . ..

> When we got married, Neil had just completed his first year at Temple University Beasley School of Law, and I worked as an elementary school teacher . . . while going to Temple University at night for my Master's Degree in Psychology of Reading. Both of us were studying/working during the day and studying during the evenings . . ..

> During the summer of 1979, Neil studied diligently to pass the Pennsylvania Bar while our neighbors were laughing and playing volleyball out back. But that never distracted or disturbed Neil . . .. He sacrificed the here and now for future happiness of his family. In fact, Neil always sacrifices himself for the sake of others as his greatest pleasure is to make other people happy.

> There are many things that attracted me to Neil. He was/is polite and courteous; when he opened the car door for me on our first date, I fell in love! Neil offered great advice. In gym class, I was to choose the grade that I felt I earned. I was going to give myself a "B" until Neil said to me that if I don't give myself a boost, then no one else will. That provided me with confidence in myself . . ..

---

and owing to Mittin while he was employed by G&C (which were not and are not part of the calculation of the loss to G&C, as the Government did not agree to allow any consideration for the same in the agreed-upon loss calculation), as well as against Merrill Lynch in its capacity as the plan administrator of the G&C Profit and Pension Plan and against the plan's trustees, for claims arising as a result of the defendant's denial of access to his funds in the pension plan (which denial resulted in Mittin's being unable to make a larger restitution payment in 2019 , thereby likely increasing the federal income taxes that may be due when funds are withdrawn from the plan). Accordingly, the government's claim that Mittin "even began the process to institute legal action against the victim" (Gov't Br. at 17) is incorrect, misleading, and directly contradicted by the facts.

Neil and I raised two daughters, Stacey and Jamie, and he was/is an exemplary father . . ..  A more devoted and loving family man you will not find.

\*\*\*

In August of 2001, I broke the 5th metatarsal of my right foot, and I was in a non-weight bearing cast for six weeks.  No one could have been more helpful than Neil.  The easiest part for me was that I didn't even have to ask for help!  He made me breakfast and lunch every morning and brought it upstairs in a cooler so I wouldn't have to crawl down the steps.  He bought me a shower chair and covered my cast for me so I could shower . . ..  I could not have recovered as easily as I did without Neil's help.

\*\*\*

[T]he first week in December has reminded me that during the winter months, Neil, on his own, will clean off the snow and ice from my car and warm it up for me . . ..  There are so many little things that Neil does for me, his family and his friends that sometimes it's hard to remember!  He is, indeed, a gem!  I'm not sure how the world would function if Neil wasn't here to help everyone . . ..

\*\*\*

All of us trust [Neil's] instinct and knowledge without hesitation.  Life would not be the same without Neil.

\*\*\*

When Neil and I married, I took a vow ". . . for better or for worse . . ."  I stand behind that vow.  Neil is a good-natured, loving, kind, and sincere soul.  He is a true mensch . . ..  He makes everyone feel special; this is truly a unique gift.  He is a wonderful son, brother, husband, brother-in-law, uncle, father, father-in-law, grandfather, and friend.  Not only is he my husband, but he is my best friend . . ..  Keeping Neil at home and allowing him to continue to serve other people in whatever capacity you deem fit would benefit society . . ..

## Loving and Supportive Father

*Daughter Jamie:*

I am the second and youngest child of [my parents] . . ..  [My father] understands that he has done wrong and expresses remorse for his actions . . ..  For that, I continue to learn and respect him.

As far back as I can remember, I wanted to be just like my father.  He is smart, trustworthy, hard[-]working, and selfless . . ..  I even went to law school and chose the same career path as him to share that special bond with him.  To me, being like my father is the highest compliment . . . he was the first person who

read and provided feedback on my entire Law Review note from start to finish . . ..

To say my father has done and will do anything for me is an understatement.  It is, perhaps, his most outstanding characteristic; he always did and will do anything for my sister, Stacey Salsman, and me.  When I was younger, this ranged from never missing a soccer game or a dance recital to coaching me in softball.  In middle school and high school, he never missed a concert when I played the clarinet or a football game when I was a cheerleader . . ..

\*\*\*

He is always there to pick me up if I fall, and help me if I have a problem.

My father has always been extremely reliable.  I can always count on him not only to be on time to pick me upon from places, but he was always the first person to arrive . . ..

\*\*\*

My father is the most supportive dad.  When my sister and I both got into college, the George Washington University ("GW"), his wardrobe began to change and suddenly, he would only wear our college's tee shirts and hats . . ..

\*\*\*

My father is a good man who made a terrible mistake . . ..  [H]e knows that he did wrong and regrets what he did every single day of his life . . ..  I would feel lost without him and truly cannot live without him . . ..  He is the most loving and caring father and grandfather in the world.

*Daughter Stacey:*

Your Honor, I am Stacey Mittin Salsman, [my father's] oldest daughter . . ..

I don't know what I would do without [my dad] in my life . . ..  Family has always been important to me . . ..  Five years ago, [my husband and I] moved back to the Philadelphia area so we could raise our family close to my parents.  I see my dad at least once a week, and he plays an integral part in my kids' lives.

My dad is one of a kind.  He is patient, kind, giving, and understanding.  He always puts others first, and he would do anything for my sister, Jamie Mittin Liebman, or me.

\*\*\*

My dad has always been a very protective father toward my sister, Jamie, and me . . ..

When my youngest daughter . . . was turning a year old . . . I was diagnosed with pneumonia.  Andy [my husband] was working nights and weekends, so he wasn't around much, and I often had to take care of our kids by myself.  I was on very heavy medication, and I had trouble breathing because of the illness.  I think I missed a week of work, but my bigger fear was that one of my kids would get sick.  We were living in Fairfax, Virginia, at the time, and my dad drove – by himself – to pick up the girls and take them back to my parents' house in Huntingdon Valley, Pennsylvania. He drove himself three hours there and three hours back . . ..

Halloween fell during a transition period for Andy [my husband] and me five years ago.  Andy had recently started working in New York City; our daughters and I were still living in Virginia while we looked for a new home.  I was overwhelmed and disappointed to be alone with both girls . . ..  My dad knew I was upset, and he drove in just for the night to be with the girls and me.  He helped us celebrate Halloween, give out candy . . ..  That's the kind of person he always has been – willing to be there for us, even for just one night.  I really don't know what I would do without him around and helping me so much.

***

My dad is also very smart.  I don't know how he knows about all the things he knows.  I remember being in high school, and he was always helping me to study, and he knew all the answers.  He always made sure my sister and I were prepared for each test, and he advised us on how to take a test the proper way.  He was always proud of us and made sure to tell us daily how great women we are and how good we could be.

***

I am, without a doubt, the proudest of him now, though.  He is going through a lot and I have never been more proud of how he has accepted responsibility for his mistakes.  It has been tough to watch my dad go through this.  I wish you could know my dad how I know him, and I would miss him if I wouldn't get to hear his voice or see him every day.

**Loving and Doting Grandfather**

*Wife Fern:*

Neil's four granddaughters are the light of his life.  Zayzee [Mr. Mittin] was the one who gave each baby their first bath after the umbilical cord fell off.  When our first granddaughter . . . was ready for her first bath, Stacey [our daughter] didn't have a baby bathtub.  So Neil went to the nearest [store] . . . and showed up at the door carrying one he had just purchased!  This was a tradition and a fond memory that both daughters will always remember . . ..  Neil babysits quite frequently, giving the girls['] dinner, baths, reading them stories, and then laying

down with them until they fall asleep, just as he did with our children.  He has attended their Shabbat programs and school[ ] events; such as, the science fair and school plays, in addition, to all the dance recitals.  He never forgets to buy them flowers!  The two youngest girls, 19[-]month[-]old twins, enjoy being in Neil's presence as well.

*Daughter Jamie:*

Now, he [my father] is the best grandfather to my twin girls.  He is the most hands-on grandfather, changing innumerable diapers and giving both girls their first baths, a tradition that we have since he has given everyone their first bath . . ..  He sets up their cribs himself because my husband and I are not handy.  When we come in at night and my kids are sleeping in their car seats, he is waiting outside in the driveway to help us unpack our car and transfer his sleeping grandchildren into their cribs.  In the morning, he is awake before us and when we go downstairs to heat up their morning bottles, we are never surprised to see him standing in the kitchen telling us that he's already made their bottles and heated the water in the pot to warm the bottles.  He cooks their meals when we are home and even does their laundry . . ..  Last summer, when my daughter got a stomach bug and was throwing up non-stop, my husband and I decided to take her to the Emergency Room . . ..  We were worried that we may need some guidance so we called my parents, and my dad drove over two hours to Hackensack Hospital to help us.  He stayed the entire time we were there and provided guidance and assistance to our medical decisions.

*Daughter Stacey:*

Every time my girls say his name, he gets happy.  I see his smile.  Not a day goes by that he doesn't call on the phone or text to ask: how is V[.]?  How is S[.]?  How did they sleep?  When's their next soccer game?  Can I see them Saturday?  Sometimes I have had to get to work earlier than usual, and my dad has come over and get the girls dressed, give them breakfast, and put them on the bus . . ..  He just has a knack for his kids and his grandkids, and I really don't know what my girls and nieces would do without him around.  Having grandparents in your life is special.

## Dedicated Son

Mr. Mittin is dedicated to his 94-year-old mother, who currently lives in a nursing home.

Mr. Mittin's mother has "mobility problems and is confined to a wheelchair, has Crohn's

disease, and has relied on a colostomy bag since having her large bowel removed at age 40"

(PSR ¶ 76).  Mr. Mittin is "hands on when she need something" and orders her medical supplies

(*Id.*).  He is his mother's contact person and sees her every week (*Id.*).  As his mother has stated,

"I am 94 years old and I am physically compromised and unable to walk on my own without help." She continues, "[m]y son is a kind and gentle man. If someone needed help he was always the first one to step forward. Neil visits me weekly where we have the opportunity to talk together about his family, his work, and his life. He has a wonderful wife Fern, two married daughters and four grandchildren." Mr. Mittin's sister, Barbara Felzer remarks, "[Neil] is a devoted son to our elderly mother who is 94 years old and lives in a nursing facility. He shows emotional support and comfort for our mother who is intact mentally but physically compromised." Mr. Mittin's cousin, Helen W. Cohen, states that "Neil's 94 year old mother is a resident at The Abramson Center for Jewish Life . . .. I visit my aunt, Nettie Mittin, every Thursday when I am there. I know that Neil calls her every day. He often calls when I am there so I have spoken to him often. I also know that Neil visits his mother every Sunday." Steven and Myrna Pressman, longtime friends of Mittin, state that "Neil is a devoted son. He is a steady and reliable visitor to his Mother who resides in an assisted living community. He spends time talking and discussing current events with her. He shops for her and is always there for her."

Mr. Mittin is also very close to his sons-in-law, who think of him as a father, look up to him, and rely on him for advice and help in many areas of their lives (*see* letters from Andrew Salsman [my father-in-law "has been like a father to me"] and Adam Liebman ["he has made me feel like a member of the family and most importantly, a son"]). Mr. Mittin is also a supportive uncle, brother-in-law, and cousin. As his brother-in-law, Leonard Abrams, has remarked, "For seventeen years I was married to Neil's sister, Delsey, until her untimely passing in 1993 at the age of forty-two after a protracted illness. Neil was a constant source of support and consolation to me and my three young children over the course of Delsey's illness and for an extended period of time following her death."

29

Mark and Sandy Finestone state that Neil "is so dedicated to his grandchildren that it hurts" to think that "Neil may be unable to see them in the future," and "Neil is also a model husband."  In short, Mittin "is the glue in the family" (Letter of Caren Liebman).

One thing is clear in all the letters of support submitted on Mittin's behalf:  a sentence that requires prison time would have obvious emotional and other negative consequences on Mittin's family, which further supports a downward variance.  *See Howe*, 543 F.3d at 131-32, 137 (affirming non-custodial sentence, relying in part on a finding that defendant was "a devoted husband, father, and son," despite a guidelines range of 18-24 months of imprisonment).  *See also United States v. Diambrosio*, No. 04-66, 2008 WL 732031, at *3, *5 (E.D. Pa. Mar. 18, 2008) (although the court was "mindful of the seriousness of the offense and the substantial financial losses," it imposed a non-custodial sentence due to defendant's family circumstances, despite a sentencing guidelines range of 46-57 months of imprisonment, noting that defendant had "strong family . . . ties" and a "history of . . . unwavering emotional and financial support of his family" and incarceration would have an "exceptionally adverse effect on Defendant's family . . . . ").

### 8.   The other § 3553(a) factors also support a non-custodial sentence.

First, this Court also should consider that a non-custodial sentence here would promote respect for the law and provide just punishment.  *See* 18 U.S.C. § 3553(a)(2). Although custodial sentences are more severe than probationay ones, "it is not *severe* punishment that promotes respect for the law, [but] *appropriate* punishment." *Olhovsky,* 562 F.3d at 551 (emphasis in original).  Even the Supreme Court has recognized that offenders on probation are subject to conditions that substantially restrict

their liberty. *See Gall v. United States,* 552 U.S. 38, 48 (2007).  As the Supreme Court

explained:

> [p]robationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5Bl.3.
>
> Most probationers also are subject to individual 'special conditions' imposed by the court.  Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer.

*Gall,* 55 U.S. at 48-49.

Second, the Court should consider that a non-custodial sentence will protect the public,

because, as discussed above, Mittin, a 65-year-old first-time offender, has an extremely low risk

of recidivism.  He was released on bond and has complied with all the conditions of release (PSR

¶ 80).  *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History*

*Computation of the Federal Sentencing Guidelines* (May 2004), at 6-8, 11- 12; *Recidivism and*

*the "First Offender"* (May 2004), at 13-14; *United States v. Gardellini,* 545 F.3d 1089, 1095

(D.C. Cir. 2008) (affirming non-custodial sentence, despite range of 10-16 months, because

defendant presented minimal risk for recidivism); *United States v. Duhon,* 541 F.3d 391, 394-95

(5th Cir. 2008) (affirming non-custodial sentence, despite range of 27-33 months, because there

was no indication that defendant posed a threat to public).

Third, the Court should consider that a sentence of imprisonment is not required to

deter the public from committing similar crimes, because, as noted, the prosecution of the

instant case has been well-publicized in the local, national, and international media.[16]  *See*

*Gardellini,* at 1091 (relying on sentencing court's finding that prosecution itself, as opposed

to the sentence imposed, can serve as deterrence and indicating that general deterrence may be

satisfied by non-custodial sentence in cases that get a "lot of press").  *Gall*, 552 U.S. at 54

("[A] sentence of imprisonment may work to promote not respect, but derision, of the law if

the law is viewed as merely a means to dispense harsh punishment without taking into

account the real conduct and circumstances involved in sentencing").

The Government, relying heavily upon *United States v. Cohen*, Cr. No. 19-599 (E.D.

Pa.) (Gov't Br. at 24), argues that imposing a sentence below the guidelines would "place this

case outside the norm without any compelling basis."  But *Cohen*, an unpublished case, has

very different and unique facts.  In *Cohen*, the defendant, who was an associate and then

counsel at his firm, engaged in an elaborate and sophisticated "scheme to defraud product

manufacturers, class action settlement funds, insurance companies" and his law firm "by

pursuing false subrogation claims" (*See Dkt. No. 7* (Gov't Plea Mem. at 3).  Specifically, the

defendant pursued "(1) entirely fabricated subrogation claims; and (2) legitimate subrogation

claims to which an insurance company client of the Law Firm, and not the defendant, was

entitled to the financial recovery" (*Id*.).  The defendant's scheme was "sophisticated" in that,

*inter alia*, (1) "he created and registered with the Commonwealth of Pennsylvania a legal

entity, WLSP, PLLC ("WLSP"), listing its primary place of business at the same address" as

that of his law firm; (2) he created internet domains and email addresses as well as an internet

address that used the name of his law firm; (3) he opened a bank account in the name of

---

[16]  *See* notes 8-14 *supra*.

WLSP at TD Bank, using his home address for the fake account; (4) he created fake subrogation claims by modifying the paperwork from legitimate claims that he and other attorneys had already successfully resolved of behalf of clients of his law firm and used the account to "deposit checks and received wire transmissions to collect proceeds from the fraudulent claims"; and (5) he engaged an expert engineer to examine the detective products and issue a report describing the purported defect.  The defendant caused "approximately $609,384 in additional losses" to his law firm, and the firm had to reimburse its clients for their losses based on the value of the claims.  *Id*. at 3-5.  The defendant "caused actual losses to numerous victims, including product manufacturers, class action settlement funds, insurance companies" and his law firm.  *Id*. at 5.

Given the unique facts in *Cohen* (including the sophisticated and elaborate scheme and multiple victims involved), sentencing Mittin to a non-custodial sentence would not create any sentencing disparities.

Daniel J. Siegel, Esq., who knows Mittin and the victims well, echoes, respectfully, the request for a non-custodial sentence:

> I write to Your Honor regarding the sentencing of Neil Mittin.  This is in many ways one of the most difficult letters I will ever write – because I know all of the persons involved in this matter, and my law practice focuses in part on the issues that are now before Your Honor.
>
> By way of background, I met Neil and Ed Chacker in October 1986, when I joined Gay & Chacker as a young associate.  I remained at the firm until the end of 2000, and consider Neil and Ed [Chacker] to be close friends, with whom I have excellent relationships to this day, and hopefully for many years to come . . .
>
> * * *
>
> Separately, I have authored two editions of the BPI ethnics treatise . . . and my practice – when I opened my own firm – includes representing lawyers and firms with fee and other related disputes, including ones similar to this . . . this is the

first case of which I am aware in which a lawyer faces the consequences that Neil does. It is truly a very sad day.

Thus, I write to express my hope that Your Honor will recognize that his case involves good people, one of which who made an egregious error, for which he has and will pay – personally and professionally – for the rest of his life, regardless of Your Honor's decision. It is also my hope and belief that Neil will be ordered to make restitution, but not surrender his freedom. I believe that Neil will atone for his conduct for the rest of his life, but can still make valuable contributions through community service rather than time away from society.

As I hope is clear, I care for Neil, I care for Ed, I care for Gay & Chacker, all of whom have played vital roles in helping me become the professional I am, while always recognizing the good in people. I hope that as Your Honor examines the totality of Neil's life, Your Honor will agree that a proper sentence involves making restitution and serving the community, and not with a period of time apart from his family and society.

## VI.    CONCLUSION

Mr. Mittin did not become a good man simply to prepare for sentencing and garner sympathy from the Court. As the letters of support and the information in the PSR illustrate, Mittin always has been a remarkable person throughout his entire life. He is a loving father, husband, grandfather, son, and son-in-law, and his family relies heavily upon his support and assistance. As John Adderly put it, "Neil was clearly the caretaker and patriarch of his immediate family both up on generation and down one generation." Mr. Mittin also has a lifelong passion of helping others and working for the betterment of the community. The instant offense is an aberration in an otherwise unblemished life. Mr. Mittin has taken full responsibility for his actions, is deeply remorseful, and has already paid a heavy price—he will surrender his ability to practice law, has suffered great reputational harm and has been shamed, and will pay full restitution within less than a year from his sentencing. Accordingly, for all the foregoing

reasons, we respectfully submit that the Court sentence Mittin to a non-custodial sentence, such as home and/or community confinement, and order the agreed-upon restitution.

Dated:  March 3, 2020

Respectfully Submitted,

**BLANK ROME LLP**

By: s/ *Joseph G. Poluka*
Joseph G. Poluka, Esq.
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
215-569-5624

*Counsel for Neil I. Mittin*

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph G. Poluka, Esquire, hereby certify that on March 3, 2020, a true and correct copy of Defendant Neil I. Mittin's Sentencing Memorandum was served via ECF upon the following:

> Louis D. Lappen
> Deputy United States Attorney
> 615 Chestnut St., Suite 1250
> Philadelphia, PA 19106
>
> Joseph F. Minni
> Assistant United States Attorney
> Deputy Chief, Asset Recovery and
> Financial Litigation Section
> 615 Chestnut St., Suite 1250
> Philadelphia, PA 19106

> _s/ Joseph G. Poluka_
> Joseph G. Poluka